**Paul Arons, State Bar #84970**
**LAW OFFICE OF PAUL ARONS**
**685 Spring Street, #104**
**Friday Harbor, WA 98250**
**Tel:  (360) 378-6496**
**Fax: (360) 378-6498**
**lopa@rockisland.com**


**Deepak Gupta, D.C. Bar #495451**
**(*pro hac vice*)**
**PUBLIC CITIZEN LITIGATION GROUP**
**1600 20th Street, NW**
**Washington, DC 20009**
**Tel:  (202) 588-1000**
**Fax: (202) 588-7795**
**dgupta@citizen.org**

**(Additional counsel on signature page)**

**Attorneys for Plaintiffs**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| **ELENA DEL CAMPO, et al. on behalf of themselves and all others similarly situated,** | **Civ. No. 01-21151 JW** <br><br> **CLASS ACTION** |
| **Plaintiffs,** | **REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ADOPT A DISCOVERY MANAGEMENT PLAN** |
| **v.** | |
| **AMERICAN CORRECTIVE COUNSELING SERVICES, INC., et al.** | **Date: October 30, 2007** <br> **Time: 10:00 a.m.** <br> **Courtroom 5** |
| **Defendants.** | |
| **AND CONSOLIDATED ACTION** | **Civ. No. 03-2611 JW** |

## I.  INTRODUCTION

Defendants do not dispute the factual complexity of this lawsuit, in which plaintiffs are seeking equitable and monetary relief for a putative statewide class going back as far as December 1997, with approximately 1,000,000 putative class members and at least

1  $15,000,000 in actual damages.  Nonetheless, defendants want to limit plaintiffs to ten

2  depositions, (three of which were taken in 2002), and twenty-five interrogatories.  Further,

3  defendants are asking this Court to condition plaintiffs' exercise of their state law right to

4  request public documents from state and local government agencies.  Defendants also

5  are requesting that the Court add a 14 day notice requirement to Fed.R.Civ.P. 45,

6  although they do not explain why they need to have more notice than is required by the

7  Rule.  Finally, defendants appear to ask the Court to preclude plaintiffs from deposing the

   primary individual defendants, Don Mealing and Lynn Hasney, based on the claim that
8
   plaintiffs agreed to this drastic limitation when Mealing and Hasney were deposed in
9
   another lawsuit, *Hamilton v. American Corrective Counseling Services, Inc.*, Civ. No. 05-
10
   434 (N.D. Ind.).[1]

11         Defendants' proposal to limit the number of further depositions in this lawsuit to

12  seven is unrealistic in light of the needs of this case.  Defendants' request that the Court

13  require plaintiffs to give defendants' advance notice of requests made pursuant to the

14  California Public Records Act is a tactic designed to allow defendants to dissuade district

15  attorneys from providing records that undermine defendants' claims in this lawsuit.  The

16  proposal that plaintiffs give defendants two weeks advance notice *prior* to issuing a third-

17  party subpoena is guaranteed to delay discovery.  Finally, the astounding claim that in

   September 2006 plaintiffs agreed to give up their right to depose Don Mealing and Lynn
18
   Hasney in this lawsuit is contrary to fact, illogical, and not supported by documentary
19
   evidence.
20

21  **II.  DEFENDANTS PROPOSAL TO LIMIT PLAINTIFFS TO SEVEN MORE
         DEPOSITIONS IS UNREALISTIC**

22         This lawsuit involves hundreds of thousands of putative class members and

23  potential actual damages in the tens of millions of dollars.  Plaintiffs need to be able to

24        1.  It is not clear that defendants are asking that plaintiffs be precluded from deposing
       Mealing and Hasney.  Defendants' proposed discovery plan does not include this limitation.
25     However, defendants' devote more than one page of their eight page supporting memorandum
       attempting to establish that plaintiffs agreed that they would not depose Mealing and Hasney in
26     this action.  Plaintiffs will address the alleged agreement below.

1   take more than a total of ten depositions to cover the factual issues in this litigation.  In

2   the Consolidated Complaint filed on May 1, 2006, (Dkt. No. 196) plaintiffs plead a

3   statewide class.  Currently, there are five remaining causes of action, five representative

4   plaintiffs and eleven remaining defendants.   No parties have yet been deposed in this

5   action.

6         Defendants operated a check collection program, under individual contracts with

7   county district attorneys.  Although the numbers are in flux, plaintiffs believe that ACCS

8   has had contracts with district attorneys in at least thirty California counties during the ten

9   years at issue in this lawsuit.  Plaintiffs contend that ACCS' collection operation is

10  computer-driven, and operates without direct supervision or control by each district

11  attorney.  ACCS strenuously disputes this.  It argues that it merely provides

12  administrative support and puts on a diversion class, and asserts that each district

13  attorney has extensive involvement in the operation of the ACCS program in each

14  county.  To address these factual issues, plaintiffs will have to take depositions of at least

15  a representative sample of ACCS' district attorney clients.  As ACCS fleshes out its

16  claims, it may be necessary to take additional district attorney depositions.  In *Hamilton v.*

17  *American Corrective Counseling Services, Inc.*, in support of its motion for summary

18  judgment, ACCS proffered testimony from five individuals who were current or former

19  employees of the prosecutor's offices in two of the six Indiana counties that subscribed to

    ACCS' services.

20        Although plaintiffs believe that the ACCS collection program is materially the same

21  in each county, and there have not been any material changes in the last ten years,

22  ACCS denies this.  Thus, to establish commonality and typicality for a statewide class,

23  plaintiffs may have to show that, for each California county, there are common questions

24  of law and fact, *i.e.*, that the ACCS collection operations in each county are sufficiently

25  similar that statewide class certification is appropriate.  Plaintiffs may also have to show

26  that ACCS' treatment of each of the five class representatives is typical of the way that it

REPLY MEMO. IN SUPPORT OF MOT. TO ADOPT DISCOVERY MANAGEMENT. PLAN Civ. No. 01-
21151: Page 3

1   treats check writers throughout California.  Thus, plaintiffs may need to depose both

2   defendants and some district attorneys to support class certification.

3       In November 2004, defendants Mealing and Hasney sold their majority interest in

4   ACCS to new owners.  Plaintiffs contend that during the ten-year class period,

5   defendants' collection practices have remained materially the same, and were not

6   affected by the November 2004 transfer.  In *Hamilton*, however, defendants have taken

7   the position that the transfer, in essence, "wiped the slate clean" and that evidence of

8   pre-transfer practices is irrelevant to ACCS' post-transfer collection conduct.  Thus,

9   plaintiffs may need to obtain evidence of ACCS' conduct at various points throughout the

10  ten year class period.  This may require deposition testimony from defendants

11  themselves, from current or former employees who were actually involved in daily

    operations, and from some district attorneys.

12      In connection with at least two issues, it will also be necessary to depose some of

13  the merchants that send dishonored checks to ACCS for collection.  Assuming,

14  *arguendo*, that ACCS' program is lawful, at least in part, plaintiffs claim that ACCS

15  collects a merchant bank charge that is unlawful.  Under California law, in addition to the

16  amount of the check, the district attorney is entitled to collect and pay to the merchant,

17  the merchant's *actual bank charge*; *i.e.*, the amount the merchant's bank actually charges

18  the merchant when a customer's check is dishonored, *up to a maximum of $10 per

    check*.  Penal Code § 1001.65.  To the best of plaintiffs' knowledge, ACCS *always*

19  demands that the check writer pay a $10 bank charge.  However, most merchants pay

20  less than $10.  In fact, major merchants appear to pay less than $1, and Walmart, a

21  major ACCS client, pays nothing at all.  To establish this claim, plaintiffs will have to

22  obtain evidence of the merchant's actual charge.  Plaintiffs will seek to establish this

23  through a representative sample of merchants, but this is information that must come

24  from the merchant, since it is not likely that ACCS has any admissible evidence on this

25  issue.  Additionally, another major referral source is Certegy, Inc., a major national check

26  collection company.  Plaintiffs' information is that ACCS demands payment of the $10

REPLY MEMO. IN SUPPORT OF MOT. TO ADOPT DISCOVERY MANAGEMENT. PLAN Civ. No. 01-
21151: Page 4

bank charge on all Certegy-referred checks, despite the fact that Certegy is not the payee of the checks, and did not incur any bank charge.  Therefore, it will be necessary to depose Certegy, Inc.[2]

Further, as explained in plaintiffs' opening memorandum, ACCS denies that it has agreements directly with merchants, and argues that this is a key fact making it something other than a debt collector.  However, plaintiffs have information that ACCS has agreements with both Walmart and Certegy , Inc.,  ACCS also claims to have exclusive referral arrangements with other national retailers, such as Safeway, Target, CVS and Kroger, which implies some kind of contractual relationship.  .

For these and the other reasons that plaintiffs have advanced, more than seven more deposition will be necessary.  Plaintiffs have proposed that they be allowed to depose each defendant, up to seven merchants, up to ten current or former employees, and two representatives of the two district attorney professional organizations involved in lobbying for the 2006 FDCPA amendment.  Plaintiffs are also asking that they be allowed to depose district attorneys, as necessary based on the positions that ACCS takes in this case as to district attorney involvement in the collection process, and differences between the ACCS program in various counties.  None of this is excessive in light of the scope of this lawsuit.

### III.  THE COURT SHOULD NOT LIMIT OR CONDITION THE RIGHT OF ANY PERSON TO REQUEST RECORDS PURSUANT TO THE CALIFORNIA PUBLIC RECORDS ACT

Pursuant to the California Public Records Act.  Cal. Gov't. Code §§ 6250, *et seq.* [CPRA], any person may request records from a California state or local government agency.[3]  At various times since this lawsuit was filed, plaintiffs' counsel Paul Arons has

---

2.  Over the years, Certegy has gone by different names, including Telecheck, Equifax Check Services, Inc., and Fidelity National Information Services, Inc.

3.  Cal. Govt'. Code § 6253(b) provides:

(b) Except with respect to public records exempt from disclosure by express provisions of law, each state or local agency, upon a request for a copy of records that reasonably describes an identifiable record or records, shall make the records promptly available to any person upon payment of fees covering direct costs of

REPLY MEMO. IN SUPPORT OF MOT. TO ADOPT DISCOVERY MANAGEMENT. PLAN Civ. No. 01-21151: Page 5

requested records from district attorneys pursuant to the CPRA.  In response, district

attorneys have provided many of the documents needed to establish plaintiffs' claims,

including documents that drastically undermine ACCS' claims that it is providing district

attorneys nothing more than limited clerical assistance and holding diversion classes.[4]

Each time plaintiffs have made CPRA requests, ACCS has sought to dissuade district

attorneys from providing documents, with varying degrees of success.[5]  The most recent

CPRA request was made on May 11, 2007.  Before the month was out, ACCS appears to

have circulated to its district attorney clients two memoranda containing legal advice

suggesting that district attorneys withhold documents.

        A May 27, 2007 memorandum from ACCS, disparages plaintiffs' counsel and

provides district attorneys with three alleged justifications for withholding documents.[6]  In

a second memorandum dated May 30, 2007, the "ACCS Team" distributed a legal

memorandum authored by ACCS' counsel Charles Jenkins concerning the CPRA.[7]  The

memorandum includes the ominous statement:

> **[R]ecords which do not exist obviously cannot be disclosed.**  5/30/07
> Memorandum, p.2, Sec. III.B.

        The Jenkins memo then continues with a general discussion of grounds for

withholding records, and an itemized listing of reasons for withholding the specific

documents sought in the May 11, 2007 Public Records Act request.  As with ACCS' prior

attempts to interfere with a Public Records Act request, the district attorneys' response to

this memorandum was varied.  Some district attorneys seem to have ignored this

---

duplication, or a statutory fee if applicable.  Upon request, an exact copy shall be
provided unless impracticable to do so.

4.  In an October 4, 2004 letter from ACCS to the Marin County District Attorneys' Office, in
which ACCS soliciting the district attorney's business, ACCS claims that it operates a "turnkey"
program, requiring "minimal effort" from the district attorney.  Plaintiffs attach a copy of this letter
as Exhibit 2 to the Supplemental Declaration of Paul Arons, filed herewith.

5.  See Supplemental Declaration of Paul Arons, filed herewith..

6.  Exhibit 5 is a copy of a 5/27/07 email from Kristy Silguero to David Ball in the office of the
Marin County district attorney, which was produced by the Marin County District Attorney in
response to a Public Records Act request.  It appears to be generally directed to all of ACCS'
prosecutor clients.

7  Exhibit 6 is a copy of a 5/30/07 email, which was produced by the Marin County District
Attorney in response to a Public Records Act request.

attempted interference.  On the other hand, in Madera County, ACCS' influence was obvious when the district attorney refused to produce documents as a result of ACCS "concerns" with trade secrets and privacy.[8]

Whether ACCS has crossed the line and attempted to improperly influence the testimony of potential witnesses is not a determination that plaintiffs have asked this Court to make.  However, defendants' proposal that they be given advance notice of any Public Records Act request is clearly intended to let them know which district attorneys plaintiffs have contacted so that defendants can attempt to dissuade the district attorney from producing responsive documents.  For that reason alone, defendants' proposal should be rejected.  Moreover, neither plaintiffs nor defendants are required to inform their adversary of their investigative efforts, except as required by the Federal Rules.  A public records act request is nothing more than an investigative tool.  Plaintiffs are no more required to keep defendants apprised of their investigative efforts than defendants are required to inform plaintiffs that a district attorney has provided ACCS a document that it may consider using in the preparation of its defense.

Finally, it is not clear that this Court has the authority to interfere in any way in any person's exercise of the California statutory right to request public records.

## IV.  DEFENDANT PROPOSAL THAT PLAINTIFFS BE REQUIRED TO PROVIDE ADVANCE NOTICE OF THEIR INTENT TO SUBPOENA DOCUMENTS FROM MERCHANTS IS DESIGNED TO DELAY THE LITIGATION AND ALLOW DEFENDANTS TO INTERFERE WITH DISCOVERY

Fed.R.Civ.P. 45 prescribes the rules for issuing subpoenas to third parties.  It does not require fourteen days advance notice.  It is common for a third party receiving a subpoena to ask for, and to receive, an extension of time to respond, so that documents are rarely produced sooner than three or four weeks from the date a subpoena is served, and often longer.  By building in a fourteen day window before a subpoena can even be served, defendants proposal will add at leas two weeks delay to subpoena compliance.  It

_____

8.  Copies of a June 11, 2007 and June 27, 2007 letters from Madera County Counsel to Paul Arons responding to his Public Records Act request and refusing to produce documents, are attached to the Supplemental Declaration of Paul Arons as Exhibits 7 and 8, respectively..

REPLY MEMO. IN SUPPORT OF MOT. TO ADOPT DISCOVERY MANAGEMENT. PLAN Civ. No. 01-21151: Page 7

would also allow a forewarned merchant that is cooperating with defendant to take steps to make it difficult or impossible to provide responsive documents.[9]  The parties have routinely cooperated on scheduling matters in the past.  When ACCS unsuccessfully sought to quash subpoenas that plaintiffs had issued to Target and Safeway in this action, it was able to have the matter determined without fourteen days advance notice.  It has not provided any reason why Rule 45 needs to be altered to give ACCS an opportunity to object before a subpoena is even served.  Defendants' proposal should be rejected.

## V.  PLAINTIFFS NEVER AGREED TO LIMIT THEIR RIGHT TO DEPOSE DON MEALING AND LYNN HASNEY IN THIS ACTION

Defendants' claim that Paul Arons, while representing the plaintiffs in *Hamilton v. ACCS*, agreed that the *del Campo* and *Hamilton* plaintiffs would combine to take one deposition each of Don Mealing and Lynn Hasney, as the sole deposition of these two taken in both *Hamilton* and in this action.  In making this claim defendants, at best, have a dramatically distorted recollection of a minor conversation.[10]

In September 2006, near the close of discovery in *Hamilton*, plaintiffs took the depositions of Don Mealing and Lynn Hasney, both as individual defendants, and as Rule 30(b)(6) designees for ACCS Administration, Inc., Fundamental Performance Strategies, Inc. Fundamentals, and Fulfillment Unlimited, Inc.  Many of the issues in *Hamilton* and *del Campo* overlap, since both cases concern the common practices of defendants check collection program, operated in a number of different states.  Therefore, the parties agreed, off the record, that the depositions could be used in either case.  This agreement was not particularly significant to plaintiffs, since plaintiffs would be free to use any sworn testimony of Mealing and Hasney in *del Campo*, regardless of the forum in which the testimony was taken.  This was a brief discussion and there were no other agreements.

---

9. As ACCS advised district attorneys, ***"Records which do not exist obviously cannot be disclosed."***  Plaintiffs cannot require a third party to preserve documents unless those documents have been subpoenaed.

10. *See* Supplemental Declaration of Paul Arons, filed herewith.

REPLY MEMO. IN SUPPORT OF MOT. TO ADOPT DISCOVERY MANAGEMENT. PLAN Civ. No. 01-21151: Page 8

Defendants and plaintiffs discussed the fact that at last the Mealing deposition would take more than one day, but his was because in *Hamilton* there were many areas of permissible inquiry, and both Mealing and Hasney were being produced to testify as individual defendants, and as the Rule 30(b)(6) designees of all corporate defendants, other than ACCS, Inc. itself.  The parties did not bargain for a multi-day deposition. Rather, this was merely a recognition on defendants' part that the Mealing deposition in *Hamilton* would legitimately take more than one day.  Plaintiffs did not agree that they would not depose Mealing or Hasney in *del Campo*.

If defendants had asked plaintiffs to agree that this would be the only deposition of Mealing and Hasney in the two lawsuits, plaintiffs would have refused, because there was no reason to make that concession, and compelling reasons not to.  First, there was nothing going on in either lawsuit that would have made such an agreement advantageous to plaintiffs.  In *Hamilton*, discovery was coming to an end.  Defendants were obligated to produce Mealing and Hasney for deposition.  Plaintiffs had no need to make any compromises to go forward with these depositions in *Hamilton*.  On the other hand, while discovery in *Hamilton* was coming to a close, it was just getting underway in *del Campo*.  As of September 2006, plaintiffs had served written discovery on most of the defendants, but did not yet have any substantive responses.  Defendants had not yet produced documents in response to the pending discovery.  Plaintiffs would not want to depose Mealing and Hasney, who were critical witnesses in *del Campo,* without first having an opportunity to review written discovery responses and documents.

Further evidence that there was no such agreement is that fact that defendants' claim that this is a verbal agreement that was reached before commencing the depositions, yet defendants' counsel did not put the alleged agreement on the record, or confirm the agreement in writing.  A careful lawyer who had obtained a significant concession from the adverse party would certainly have done more to solidify the agreement.

The negotiations of the discovery management plan prepared by defendants undercut any claim that plaintiffs agreed to tie their hands in deposing Mealing and Hasney in *del Campo*.  The parties began negotiating a discovery plan in July 2006.  In *Hamilton*, the deposition of Don Mealing is taken on September 7 and 8, 2006, and the deposition of Lynn Hasney is taken on September 22, 2006.  .

On November 16, 2006, defendants forward their draft of the discovery plan Defendants state that three depositions have been taken in this action, referring to the depositions of George Kennedy, Bruce Rayed, and Fry's, Inc., all taken in 2002. Defendants do not mention the *Hamilton* depositions.[11]

Defendants do not claim the *Hamilton* depositions have any bearing on plaintiffs' right to depose Mealing and Hasney in *del Campo*, until August 16, 2007.  Plaintiffs return a marked up copy of the draft, which includes plaintiffs' denial that there was any agreement to limit the Mealing or Hasney depositions.[12]  Defendants do not respond.

In short, although defendants claim that in September 2006 the parties agreed to limit the Mealing and Hasney depositions in *del Campo*, they did not mentioned this alleged agreement until August 2007, despite the fact that that parties were exchanging multiple drafts of a proposed discovery plan.

Finally, defendants claim that the deposition testimony in *Hamilton* establishes that plaintiffs were deposing Mealing and Hasney for both lawsuits.  However, the testimony shows only that there are factual issues common to both lawsuits.  Elena del Campo is the only California plaintiffs whose name is mentioned, and her name only came up in connection with interpreting a computer-generated form used in 2001.  The other plaintiffs are not mentioned.  To the extent that California district attorney's are mentioned, it was only as examples of how the nationwide ACCS program operates.

---

11. A copy of the November 16, 2006 plan proposed by defendants, along with the email that accompanied it, is attached as Exhibit 3 to the Supplemental Declaration of Paul Arons.

12. A copy of defendants' August 16, 2007 proposed plan, as annotated and edited by Paul Arons and emailed back is attached as Exhibit 4 to the Supplemental Declaration of Paul Arons.

REPLY MEMO. IN SUPPORT OF MOT. TO ADOPT DISCOVERY MANAGEMENT. PLAN Civ. No. 01-21151: Page 10

1    In sum, when Mealing and Hasney were deposed in *Hamilton*, this was in

2  connection with the *Hamilton* lawsuit.  The *del Campo* plaintiffs did not have any reason

3  to agree to limit their right to fully depose Mealing and Hasney in this action, and the

4  documentary record casts doubt on defendants' candor in making this claim.

5  **VI. CONCLUSION**

6    Wherefore, for the reasons stated above, plaintiffs respectfully request that this

7  Court adopt the discovery management plan proposed by plaintiffs.

8  DATED:  October 17, 2007              LAW OFFICES OF PAUL ARONS

9                                             By s/ Paul Arons
                                                 PAUL ARONS
10                                             Attorneys for Plaintiffs
   Additional Plaintiffs' Counsel
11                                             O. Randolph Bragg, Ill. Bar #06221983
                                               HORWITZ, HORWITZ & ASSOCIATES
12                                             25 East Washington, Suite 900
                                               Chicago, IL 60602
13                                             (312) 372-8822

14                                             Ronald Wilcox, State Bar #176601
                                               LAW OFFICE OF RONALD WILCOX
15                                             2160 The Alameda, 1st Flr., Suite F
                                               San Jose, CA 95126
16                                             Tel:  (408) 296-0400
                                               Fax: (408) 296-0486
17
                                               Lester A. Perry (2571)
18                                             Hoole & King
                                               4276 South Highland Drive
19                                             Salt Lake City, Utah 84124
                                               Telephone: (801) 272-7556
20                                             Fax: (801) 272-7557
   ReplympaMotDiscoveryMgmtPlan 101607.doc
21

22

23

24

25

26