UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| ELENA DEL CAMPO, et al. on behalf of themselves and others similarly situated, | ) ) ) | Case No.: C 01-21151 JW |
| Plaintiffs, | ) ) | **ORDER GRANTING PLAINTIFF'S MOTION TO COMPEL** |
| v. | ) ) | **[Docket No. 680]** |
| AMERICAN CORRECTIVE COUNSELING SERVICES, INC., et al, | ) ) ) | |
| Defendants. | ) ) | |

Pursuant to Fed.R.Civ.P. 37(a), Plaintiffs moved to compel the production of documents on the grounds that the discovery sought is relevant to the subject matter of the action, reasonably calculated to lead to the discovery of admissible evidence, and is not protected from disclosure by any privilege.  Defendants oppose production, asserting that the discovery of the non-ACCS entity Defendants' financial records is irrelevant, is not reasonably calculated to lead to the discovery of admissible evidence, and invades Defendants' privacy rights.  On October 21, 2008, the parties appeared before Magistrate Judge Patricia V. Trumbull for hearing on Plaintiff's motion to compel. Having considered the parties' arguments,

IT IS HEREBY ORDERED that Plaintiff's Motion to Compel production of documents from Defendants Don R. Mealing and Lynn Hasney for the years 2001 to 2004 is GRANTED, subject to

1   the stipulated protective order previously entered in this action.[1]

2

3      **I.      BACKGROUND**

4         Plaintiffs' class action is based on Defendants' operation of a check collection business.

5   Plaintiffs claim that American Corrective Counseling Services, Inc. ("ACCS") violated, *inter alia*,

6   the Fair Debt Collection Practices Act ("FDCPA") and state law in administering bad check

7   diversion programs with various California district attorneys.

8         From approximately 1996 to 2004 Defendants Don Mealing ("Mealing") and Lynn Hasney

9   ("Hasney") were the sole shareholders of ACCS and actively managed the business.  ACCS

10  contracts with numerous California district attorneys to help operate bad check diversion programs.

11  Through these programs, the district attorney may offer bad check writers the opportunity to avoid

12  prosecution by completing a class on financial responsibility, paying full restitution to the victim,

13  and paying any fees associated with the program.  ACCS provides instructors and materials for the

14  financial responsibility class, and provides ministerial services to help the district attorneys recover

15  restitution for the victims.

16        In 2001, Defendants Mealing and Hasney formed ACCS Administration ("ACCS Admin."),

17  Fulfillment Unlimited, Inc. ("FUI"), Fundamental Performance Strategies ("FPS"), and Inc.

18  Fundamentals.  Defendants state that while some of these entities contracted with ACCS, each of the

19  entities functioned separate and apart from ACCS and each had legitimate business purposes.

20  Plaintiffs, on the other hand, allege that each of these entities participated in operating the check

21  program and that all of the corporations, including ACCS, were the alter egos of Defendants

22  Mealing and Hasney.

23        Plaintiffs assert that the discovery they are seeking is reasonably calculated to lead to the

24  discovery of admissible evidence concerning alter ego liability.  Plaintiffs assert that the financial

25  discovery they seek is the type of information relevant to determining whether an alter ego

26  relationship exists because it may show, among other things, payment of non-corporate expenses by

27

28        [1]      The holding of this Court is limited to the facts and the particular circumstances
   underlying the present motion.

1  a corporation or the siphoning of funds from the corporation by the dominant stockholder.  Plaintiffs

2  also argue that what evidence they have obtained thus far further supports their claim that the entity

3  defendants are the alter egos of Mealing and Hasney.

4        In response, Defendants first argue that Plaintiffs' requests are over broad because they

5  request information from December 1997 to the present.  This time period is not limited to the time

6  that the non-ACCS Defendants actually worked with ACCS, specifically, the years from 2001 to

7  2004.  Defendants next argue that Plaintiffs have failed to show that the information requested is

8  directly relevant to this case.  They claim that Plaintiffs' alter ego theory only puts ACCS' financial

9  information at issue, not the non-ACCS Defendants' information.  Further, they claim that Plaintiffs'

10  alter ego theory can be proved (or disproved) using ACCS' financial information and corporate

11  records, which have already been produced.  Additionally, the non-ACCS Defendants have also

12  produced their corporate and partnership records.

13        Defendants also argue that not only are Plaintiffs' requests over broad and irrelevant, they

14  are in violation of the non-ACCS Defendants' privacy rights.  By forcing the non-ACCS Defendants

15  to disclose highly sensitive and private financial information not relevant to this case, Plaintiffs are

16  invading the non-ACCS Defendants' privacy rights.  Defendants argue that Plaintiffs cannot obtain

17  private financial information from the non-ACCS Defendants unless they can show that the

18  documents are relevant and that their need for the information outweighs the non-ACCS

19  Defendants' privacy rights.  As discussed above, Defendants further argue that the non-ACCS

20  Defendants' financial records are irrelevant to the issue of whether ACCS was a mere shell

21  corporation prior to 2004.

22

23    **II.    LEGAL STANDARD**

24        Federal common law governs the issue of substantive liability for tortious acts in violation of

25  the FDCPA.  *See Newman v. CheckRite California, Inc.*, 912 F. Supp. 1354, 1370 n.19 (E.D. Cal.

26  1995).  Under federal common law, courts disregard the separation between corporate entities if

27  there are special circumstances demonstrating that the corporations should be deemed a single

28  economic enterprise.  *See U.S. v. ACB Sales & Service, Inc.*, 590 F. Supp. 561, 574 (D. Ariz. 1984).

In the Ninth Circuit, whether to pierce a corporate veil and hold a shareholder personally liable for corporate debts is based on three factors: (1) "the amount of respect given to the separate identity corporation by its shareholders;" (2) "the degree of injustice visited on the litigants by recognition of the corporate entity;" and (3) "the fraudulent intent of the incorporators." *Seymour v. Hull & Moreland Eng'g.*, 605 F.2d 1105, 1111 (9th Cir. 1979).  Other factors courts will consider include: shareholders' use of corporate assets as their own, commingling corporate funds with their own, and failure to observe corporate formalities.  *See* Friedman, CAL. PRAC. GUIDE: CORP., Ch.II B § 2:50 et al. (The Rutter Group 2008); *see also Steven v. Roscoe Turner Aeronautical Corp*. 324 F.2d 157, 161 (C.A.Ind. 1963) (listing factors to consider when deciding whether to pierce the corporate veil, including whether the parent and subsidiary corporations have common directors or officers, the subsidiary has grossly inadequate capital, and the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation).

"Tax returns and related documents do not enjoy an absolute privilege from discovery."  *A. Farber and Partners, Inc. v. Garber*, 234 F.R.D. 186, 190-91 (C.D. Cal. 2006) (internal quotations omitted).  However, while there is "no federal common law privilege akin to the right of privacy, federal courts ordinarily recognize a constitutionally-based right of privacy that can be raised in response to discovery requests."  *Id*. at 191.  The need for the information sought must be balanced against the privacy right asserted.  *Id*.

Contrary to federal law, California law affords a very strong privilege from discovery of tax records.  *Davis v. Leal*, 43 F. Supp. 2d 1102.  However, even "assuming that a state constitution creates 'a right to privacy in financial records, such state privilege[] do[es] not preclude discovery' of bank records 'in a federal court suit.'" *In re Yassi*, 225 B.R. 478, 483 (Bankr. C.D. Cal. 1998) citing *Sneirson v. Chemical Bank*, 108 F.R.D. 159 (D.C.Del.1985).  Additionally, in *Heathman v. U.S.D.C. (C.D. Cal.)*, in response to defendants' argument that discovery of copies of their tax returns violated their right of privacy, the court held that this claim was not supported by any authority and that "there [wa]s no merit in th[is] constitutional claim[]."  503 F.2d 1032, 1035 (9th Cir. 1974).

III.   DISCUSSION

A.   PLAINTIFFS' ALTER EGO THEORY

Plaintiffs allege that ACCS and all of the other entity Defendants were the alter egos of Defendants Mealing and Hasney, who are therefore personally liable for any damages arising from ACCS' unlawful collection practices.  They argue that the information they request may show, among other things, the payment of non-corporate expenses by a corporation, siphoning of funds from the corporation by the dominant stockholder, commingling of funds and other assets, failure to segregate funds of the separate entities, the misuse by an individual of the assets of the corporation, the absence of corporate assets, and undercapitalization, or the manipulation of assets and liabilities between the entities so as to concentrate the assets in one and the liabilities in another.

The discovery rules are to be interpreted liberally "to permit wide-ranging discovery of information reasonably calculated to lead to discovery of admissible evidence."  *Ragge v. MCA/Universal Studios*, 165 F.R.D. 601, 603-04 (C.D. Cal. 1995).  Plaintiffs argue that their discovery requests are reasonably calculated to lead to the discovery of admissible evidence and allege that they have already developed significant evidence showing that Mealing and Hasney manipulated the entity Defendants for their personal benefit.  For example, Plaintiffs claim that ACCS transferred virtually all of its net profit for at least 2002 and 2003 to FPS, allegedly as part of a management agreement and pursuant to a Master Factoring Agreement.  Plaintiffs argue that if they can demonstrate that Mealing and Hasney were using FPS to siphon funds from ACCS, without legitimate regard to work or services provided by FPS, this will support Plaintiffs' claim that ACCS was the alter ego of Mealing and Hasney.  *See Pearson v. Component Technology Corp.*, 247 F.3d 471, 485 (3rd Cir. 2001) (listing "siphoning of funds from the [] corporation by the dominant stockholder" as a factor to consider when determining whether to pierce the corporate veil).  Additionally, Plaintiffs claim that the Defendants' credit and loan applications may show that one Defendant is cosigning for, or guaranteeing the debt of another Defendant and Defendants' credit records may show that one Defendant is purchasing goods or equipment for use by another, further supporting their alter ego theory.

1    Plaintiffs allege that Defendants Mealing and Hasney took one corporation, ACCS, Inc., and

2    divided its functions between new corporations they created, FUI and ACCS Admin., while

3    contracting with FPS to provide management services.  FPS was a partnership between two

4    corporations, Inc. Fundamentals, a one person corporation formed by Mealing, and LRH Group,

5    Inc., a one person corporation formed by Hasney.  Plaintiffs further allege that Mealing and Hasney,

6    who controlled the financial interactions between the companies, kept ACCS, Inc., ACCS Admin.,

7    and FUI thinly capitalized by transferring all of these corporations' net income to FPS.  Plaintiffs

8    claim that after paying FPS, the other entity Defendants had almost no remaining income.  This

9    information is relevant to demonstrate whether the subsidiary has grossly inadequate capital, one of

10   the factors in determining whether a court should pierce the corporate veil.  *See Steven,* 324 F.2d at

11   161.

12       **B.    DEFENDANTS' PRIVACY CLAIM**

13   Defendants argue that the discovery of the non-ACCS Defendants' financial records invades

14   Defendants' privacy rights and is not reasonably calculated to lead to the discovery of admissible

15   evidence.[2]  Plaintiffs assert that the financial discovery they seek is the type of information relevant

16   to determine whether an alter ego relationship exists.  In the context of discovery, relevance has a

17   very broad meaning.  *Heathman*, 503 F.2d at 1035.  Plaintiffs seek financial records that may show

18   payment of non-corporate expenses by a corporation, siphoning of funds from the corporation by the

19   dominant stockholder, commingling of funds and other assets, failure to segregate funds of the

20   separate entities, the misuse by an individual of the assets of the corporation, the absence of

21   corporate assets, and undercapitalization or the manipulation of assets and liabilities between entities

22   so as to concentrate the assets in one and the liabilities in another.

23   For example, Plaintiffs argue that FPS supposedly paid over $500,000 to ACCS in 2001 for

24   the right to ACCS' future profits.  Plaintiffs are seeking evidence that would show whether or not

25   FPS actually paid any money to ACCS.  They claim that ACCS transferred almost all of its net

26

27       [2]    The Requests for Production that Defendants claim violate their right to financial privacy
28   seek, among other things, accounting and bookkeeping records for each of the entity Defendants; records of payments or transfer of money or any asset between any of the Defendants; and credit records, credit applications, loan applications, and notes. *Plaintiffs Requests for Production 12-21.*

1    profits for at least 2002 and 2003 to FPS, allegedly as part of a management agreement.  Plaintiffs

2    seek financial information to determine whether Mealing and Hasney were using FPS to siphon

3    funds from ACCS without legitimate regard to work or services provided by ACCS.  Plaintiffs also

4    allege that FPS had a consulting agreement with FUI where it is unclear what services, if any, FPS

5    provided to FUI.  Plaintiffs have demonstrated that the discovery they seek is relevant to the

6    determination of whether an alter ego relationship exists.

7            Plaintiffs also claim that there is no privacy right or privilege that prohibits Plaintiffs from

8    discovering documents that a reasonably calculated to lead to the discovery of admissible evidence.

9    They argue that in response to a privacy objection, the impact of disclosure can be protected by a

10   well-crafted protective order.  In *A. Farber and Partners, Inc. v. Garber*, the defendant raised a

11   privacy objection to document requests seeking documents, primarily bank records, regarding

12   financial transactions. *Id*. at 190.  The court stated that "plaintiff's need for defendant Garber's

13   financial documents outweighs defendant Garber's claim of privacy, especially when the impact of

14   the disclosure of the information can be protected by a carefully drafted protective order."[3]  *Id*. at

15   191 (internal quotations omitted); *See also In re Heritage Bond Litigation*, 2004 WL 1970058, *5

16   n.12 (C.D. Cal) ("Any privacy concerns Kaiser defendants have in their bank records and related

17   financial statements are adequately protected by the protective order, and are not sufficient to

18   prevent production in this matter."); *CEH, Inc., v. FV "Seafarer"*, 153 F.R.D. 491, 499 (D.R.I.

19   1994) ("While a party does have an interest in nondiscolsure and confidentiality in its financial

20   records, this interest can be adequately protected by a protective order."); *In re Yassi*, 225 B.R. 478,

21   483 (Bankr.C.D. Cal. 1998) ("[W]hatever right to privacy Movants may have in the [financial]

22   information sought pursuant to the subpoenas is insufficient to prevent discovery of that information

23   . . . .").

24           The *Garber* court held that because the plaintiff proposed a two-tier protective order to

25   protect the defendant's private financial information, the defendant was required to produce the

26   _____

27       [3]      In a footnote, the court stated that their finding that the plaintiff's need for defendant's
     financial documents outweighed defendant's claim of privacy applied to "financial records generated
28   by defendant Garber's accountants, as well as records from financial institutions, and financial records
     of business entities owned by defendant Garber."  *Id*. at 191 n.4.

financial records to the plaintiff, subject to the protective order. *Id.* The same is true here. The financial documents Plaintiffs seek are relevant to determine whether the entity Defendants were merely alter egos of Mealing and Hasney. Because there is already a protective order in place, Defendants are required to produce this information, subject to the protective order.[4]

Disclosure of private information must be "narrowly circumscribed" and "permitted only to the extent necessary for a fair resolution of the lawsuit." *Ragge*, 165 F.R.D. at 605. Therefore, because the entity Defendants did not exist until 2001, Mealing and Hasney sold ACCS in 2004, and the entity Defendants ceased doing business with ACCS in 2004, Plaintiffs' requests for Defendants' financial information are limited to information from the years 2001 to 2004.

### C.   PLAINTIFFS' DOCUMENT REQUEST RELATING TO MEALING v. RYDER

Plaintiffs request all documents relating to *Mealing v. Ryder*, California Superior Court for the County of San Diego, Civ. No. 844712, and the dispute described in the Complaint on file therein. Defendants argue that Plaintiffs may obtain these non-privileged responsive documents from the Superior Court file. Soon after the *Mealing v. Ryder* suit was filed, the parties entered into a tolling agreement and the action was stayed. No discovery was conducted by the parties. Therefore, all responsive documents are available in the Superior Court file. *See Defense Decl. of Lindsay J. Reese*, ¶¶ 6, 7. Accordingly, Plaintiffs' motion as to these documents is denied as moot.

### IV.   CONCLUSION

As discussed herein, the documents Plaintiffs request are relevant to their alter ego theory, are reasonably calculated to lead to the discovery of admissible evidence, and are not protected from disclosure by any privilege. However, because the entity Defendants did not exist until 2001, Mealing and Hasney sold ACCS in 2004, and the entity Defendants ceased doing business with

---

[4]   Additionally, the "official information privilege" does not protect Defendants' communications with government agencies from disclosure. The official information privilege does not apply here because only the government may assert this privilege. *See First Eastern Corp. v. Mainwaring,* 21 F.3d 465, 68 (D.C. Cir. 1994). Even if the privilege did apply, Defendants have not met this burden. The party asserting the privilege must "specifically describe how disclosure under a carefully tailored protective order would substantially harm a significant governmental interest . . . ." *Kelly v. City of San Jose*, 114 F.R.D. 653, 672 (N.D. Cal.) 1987. Defendants have not demonstrated how disclosure under a protective order would substantially harm a significant interest.

1    ACCS in 2004, Plaintiffs' requests are limited to information from the years 2001 to 2004, subject to

2    the stipulated protective order previously entered in this action.

3           IT IS SO ORDERED.

4
     Dated:     *November 10, 2008*
5
                                                    *Patricia V. Trumbull*
6                                                   _____
                                                    PATRICIA V. TRUMBULL
7                                                   United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28