IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ELENA DEL CAMPO, et al.,

        Plaintiffs,

   v.

DON MEALING, et al.,

        Defendants.

_____/

No. C 01-21151 SI

**ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT**

In pending motions, defendants have moved for summary judgment that there is no basis for liability against any of the defendants under the Fair Debt Collection Practice Act ("FDCPA"). Docket No. 1291. Plaintiffs have moved for summary judgment as to Don Mealing's liability under the FDCPA. Docket No. 1294.

**BACKGROUND**

**1.    Procedural Background**

This FDCPA class action case has a long procedural history. The remaining claims are brought against Donald R. Mealing and Lynn R. Hasney, who formed, owned and operated American Corrective Counseling Services, Inc. ("ACCS"), and against Inc. Fundamentals, a company Mealing spun off from ACCS.[1] Plaintiffs allege that ACCS violated the FDCPA when it implemented Bad Check Diversion programs ("Programs") for various California counties. On December 3, 2008, Judge James Ware certified a class, including the subclass relevant at this juncture: "All Members of the Umbrella Class, from whom ACCS after December 11, 2000 attempted to collect, or collected money for a check written

_____

[1] ACCS was sold by defendants Mealing and Hasney in November 2004. *See* Defendants' Opposition to Summary Judgment ("Def. Oppo.") at 4. Subsequently, ACCS filed for bankruptcy and in 2009, the Bankruptcy Court in Delaware approved ACCS's bankruptcy settlement plan. Docket No. 1020-2 (9/17/09 Order Confirming First Amended Plan).

for personal, family, or household purposes."  Docket No. 705 at 17.  The relevant period of conduct at issue is December 11, 2000 through November 2004.

On June 3, 2010, Judge Ware granted plaintiffs' motion for summary judgment as to defendants Mealing and Hasney's liability.  Judge Ware agreed with plaintiffs that defendants Mealing and Hasney were debt collectors under the FDCPA, in light of their roles – both direct and indirect – with ACCS's collection activities.  Docket No. 877.  The case went to trial on damages as to Mealing and Hasney, and on liability and damages as to Inc. Fundamentals.  On December 13, 2010, the jury reached a verdict: (1) finding defendant Inc. Fundamentals was not liable; (2) awarding plaintiffs nominal damages for Mealing and Hasney's FDCPA violations; (3) awarding one dollar to each plaintiff for statutory damages under the FDCPA; and (4) awarding $12,000 in statutory damages to the class.  Docket No. 1107.

Following the verdict, Judge Ware considered both sides' motions for a new trial and granted defendants' motion for a new trial.  The Court noted that during trial, the Court became "concerned" as to the nature of the relationship between the defendants and the district attorneys' offices, and whether the collection activity was covered by the FDCPA.  Docket No. 1177 at 6.  Relatedly, Judge Ware held that although he had granted summary judgment as to the FDCPA liability of defendants Mealing and Hasney, upon reviewing his prior orders, he concluded that he had not actually found undisputed evidence establishing that ACCS qualified as a debt collector under the FDCPA.  *Id.*

The case has since been reassigned to the undersigned.  Currently before this Court are the parties' motions for summary judgment.

## 2.    Factual Background

The following facts are not in dispute, unless otherwise noted.  Defendant Mealing founded ACCS in 1987 and remained an owner and principal shareholder until the sale of the company in November 2004.  Declaration of Jenelle Welling in Support of Plaintiffs' Motion for Summary Judgment ("Welling SJ Decl."), Ex. 46 at ¶¶ 3,4.  In 1985, California passed the Bad Check Diversion

2

United States District Court
For the Northern District of California

Act ("BCDA"), allowing district attorneys to create diversion programs for persons who write bad checks.  Cal. Penal Code § 1001.60 *et seq*.  Writing a bad check means "making, drawing, uttering, or delivering any check or draft upon any bank or depository for the payment of money where there is probable cause to believe there has been a violation of Section 476a."[2]  BCDA allowed the Bad Check Diversion Programs to be "conducted by the district attorney or by a private entity under contract with the district attorney."  Penal Code § 1001.60.  In order to determine whether a case is appropriate for referral to diversion, the district attorney "shall consider": the amount of the check, if the person has a prior criminal history, the number of bad check grievances against the person, whether there are other bad check grievances currently, and the strength of the evidence of intent to defraud.  Penal Code § 1001.62.

ACCS developed a "turn key" program, such that ACCS would run Bad Check Diversion Programs on behalf of California district attorney offices, providing both the educational class component required for diversion as well as the day-to-day administration of the program (soliciting merchant participation, applying eligibility criteria, mailing notices, communicating with program participants, collecting monies and fees, and disbursing restitution).  *See* Welling SJ Decl., Ex. 20 Tabs 1-14 (ACCS contracts).  ACCS entered into contracts with at least fourteen California counties to run Bad Check Diversion Programs.[3]  The contracts with ACCS were signed by the district attorneys and/or

---

[2]   Penal Code section 476a provides that "Any person who . . . willfully, with intent to defraud, makes or draws or utters or delivers a check . . . for the payment of money, knowing at the time of that making, drawing, uttering, or delivering that the maker or drawer or the corporation has not sufficient funds in, or credit . . . for the payment of that check, draft, or order and all other checks, drafts, or orders upon funds then outstanding, in full upon its presentation . . . is punishable by imprisonment in a county jail for not more than one year."

[3]  Neither plaintiffs nor defendants have provided the Court with a list of the California counties which had contracts with ACCS during the relevant time period.  However, Exhibit 20 to the Welling SJ Declaration attaches the contracts of Contra Costa (2004); El Dorado (2000, 2003); Imperial (2004); Los Angeles (1999); Merced (1998, 1999, 2002); Monterey (1997, 1998, 2000); Orange (1997, 2000); Riverside (1993, 1998, 1999, 2002); San Bernardino (1998, 2001, 2004); San Diego (1999, 1999, 2003); San Joaquin (1994, 1997, 2000); Santa Clara (1991, 1993, 1996, 1997, 2000); Sonoma (2001); and Stanislaus (1996, 1997, 1999, 2003).  Exhibit 27 to the Welling SJ Declaration indicates that as of October 31, 2004 at least Los Angeles, San Bernardino, Orange, Riverside, Santa Clara, San Joaquin, and Stanislaus counties, as well as the City of Oakland, had current contracts with ACCS.

by a representative of the county's board of supervisors.  *See, e.g.*, Welling SJ Decl., Ex. 20 Tab 1 (Contra Costa County contract signed by the District Attorney), Tab 4 (Los Angeles County contract signed by Chair of the Board of Supervisors).   The contracts specified the fees that ACCS was authorized to charge to the Program participants.  *See, e.g.*, Welling SJ Decl., Ex. 20, Tab  Tab 5 (Merced 2002 Contract at ¶¶ 4.D, 4.E, 6.A.3 [setting Administrative, Class and additional fees]); Tab 12 (Santa Clara 2000 Contract at ¶¶ 4.D, 4.E, 6.A.3  [same]); Tab 13 (Sonoma 2001 Contract at ¶¶ 4.D, 4.E, 6.A.3 [same]).

The contracts generally provided that ACCS was an independent contractor and should not be considered an agent of the counties.  *See, e.g.*, *Id.*, Tab 5 (Merced 2002 Contract at ¶ 16 [defining ACCS as an "independent contractor" and "[n]othing within this agreement shall be construed as creating a relationship of . . . principal and agent"]); Tab 12 (Santa Clara 2000 Contract at ¶ 16 [same]); Tab 13 (Sonoma 2001 Contract at ¶ 16 [same]).[4]  The contracts also provided that ACCS should manage the program under the provisions of the BCDA or otherwise referenced the BCDA.  *See, e.g.*, *Id.*, Ex. 20, Tab 12 (Santa Clara 2000 Contract at ¶ 2 ["under the provisions of California Penal Code section 1001.60-67, ACCS shall manage all pertinent program case files for the District Attorney" and shall conduct an educational class]); Tab 1, Schedule 1 (Contra Costa 2004 Contract, Schedule 1 [defining administrative fees as "authorized pursuant to California Penal Code Section 1001.65"]).

ACCS marketed the Programs directly to merchants to encourage merchant participation. Welling SJ Decl., Exs. 24, 25.   Participating merchants would use "bad check complaint forms" to notify ACCS of bad checks.  Those forms required the merchants to verify that the checks were not post-dated, did not involve a two-party check, were not received as a payment on an account, the merchant was not asked to hold or delay deposit, and the check did not involve an extension of credit.  *See, e.g.*, Declaration of Brett Godfrey [Docket No. 1305], Exs. D, G, H (San Clara District Attorney "Bad Check

---

[4]   The independent contractor language, which appeared to be standard in ACCS contracts through 2002, does not appear in the 2004 contracts.  *See, e.g.*, Welling SJ Decl., Ex. 20, Tab 1 (Contra Costa 2004 Contract at ¶ 13 [providing only that "ACCS employees are and shall remain the employees of ACCS, not the District Attorney."]); Tab 9 (San Bernardino 2004 Contract at ¶ 13 [same]).

1   Complaint Forms" submitted by merchants on checks written by named plaintiffs).

2       ACCS employees then used county-approved checklists to determine eligibility for the

3   Programs.  The eligibility criteria included a maximum check amount, a maximum age of the check, the

4   jurisdiction of the check, and whether or not the check was partially paid.  *See* Welling SJ Decl., Ex.

5   35 (ACCS intake check lists from multiple California counties).[5]  Normally, at that juncture, the district

6   attorneys' offices would not have been aware of what checks were included in the Programs. Welling

7   SJ Decl., Ex. 5 at 50:23 - 53:7; Ex. 12 at 56:21 - 57:3; Welling Declaration in Support of Opposition

8   to Defendants' Motion for Summary Judgment ("Welling Oppo. Decl."), Ex. 13 at 52:12 - 53:8 (no

9   district attorney employee reviews the check information between time when ACCS receives complaint

10  and sends out first letter).[6]  If a check met the eligibility criteria, ACCS would then send the check writer

11  county-approved  correspondence  on  the  letterhead  of  the  applicable  district  attorney.[7]    These

12

13          [5]  The ACCS checklists allow county employees to mark off yes or no answers to a series of
14  questions (or leave them blank, thereby agreeing to the bolded default term). *See id.*  Counties were also
    allow to handwrite in additional criteria to be used by ACCS to determine eligibility. *Id.*  Therefore,
15  the criteria to be utilized were standardized, but allowed for county-by-county exceptions.

16          [6]  Defendants point out that the ACCS contracts allowed district attorney offices to monitor at
    any time all aspects of the ACCS operation, *see* Def. Oppo. at 8, but fail to provide evidence showing
17  that district attorneys' offices knew which checks were being included in the ACCS program prior to
    ACCS making contact with the check writers.  Defendants argue that "several" counties had staff
18  maintain a desk at ACCS's headquarters, but provide no evidence of this except for Riverside County.
    *See* Def. Oppo. at 8 (citing Docket No. 830 at ¶ 4 [noting Orange County investigator had desk at ACCS
19  headquarters]).  That trial testimony, from the District Attorney of Riverside County, explained that a
    district attorney employee would receive a list of checks from ACCS for potential collection and review
20  it to *exclude* certain categories of checks, *e.g.*, individuals with criminal histories or on parole or
    probation.  *See* Docket No. 1293, Request for Judicial Notice [Trial Transcript at 1145:15 - 1147:8].

21          [7]  The parties dispute the role district attorneys and their employees took with respect to drafting
    the correspondence used in the Programs.  Plaintiffs assert that ACCS provided counties with a "turn
22  key" program packet that included samples of the checklists and letters that would be adopted by the
    counties. Plaintiffs' Motion for Summary Judgment ("Pl. SJ Mot.") at 6:9-10 & Welling SJ Decl., Ex.
23  28.  Defendants counter that the district attorneys testified at trial they they drafted the collections
    correspondence and checklists for use by ACCS, *see* Def. Oppo. at 1:15-16.  However, the trial
24  testimony cited in defendants' Opposition and Motion for Summary Judgement indicates that the district
    attorneys approved and authorized the contents of the letters and forms provided by ACCS.  *See* Def.
25  Oppo at 7:4-12 (citing trial testimony that correspondence sent by ACCS was authorized by district
    attorneys); *see also* Def. Reply in Support SJ at 3.  ACCS's contracts with the counties required ACCS
26  to "provide the District Attorney with pro forma administrative forms and proposed procedural
    guidelines for the operation of the Diversion Programs, which are to be reviewed, modified and
27  approved by the District Attorney."  Welling SJ Decl., Ex. 20 Tab 1 (Contra Costa County 2004

28                                                    5

United States District Court

For the Northern District of California

"OFFICIAL NOTICES" warned recipients that a "bad check complaint" or a "criminal complaint" or a "CRIME REPORT" had been received by the District Attorney's office. *See* Welling SJ Decl., Exs. 21, 22. The recipients were advised that the BCDA authorized the District Attorney to "waive the complaint" or "FOREGO CRIMINAL PROSECUTION" if recipients agreed to participate in the Programs. *Id.*, Ex. 21. Warnings were made that failure to comply "may result in formal prosecution on CRIMINAL CHARGES!" *Id.* Some notices informed recipients "YOU MAY AVOID A COURT APPEARANCE" if they agreed to participate, and completion of the Program would mean "THERE WILL BE NO CRIMINAL, POLICE OR COURT RECORD OF THIS MATTER." *Id.*, Ex. 22. Finally, recipients of some notices were informed that "IF YOU WISH TO APPEAR IN COURT" and contest the notice, the recipients should consult an attorney. *Id.*

If check writers agreed to participate in a program, they agreed to pay the merchant the full amount of the check due, pay any applicable bank fee related to the bad check, as well as an administrative fee and a class or program fee. *Id.*, Exs. 21, 22. The administrative fees were typically around $35 and the class fees were typically between $75 and $140. *Id.*, Exs. 20-22.

The mailing of correspondence and all communications with Program participants were handled by ACCS. *See, e.g.*, Welling SJ Decl., Ex. 20, Tab 10 (San Diego Contract at 5.A.1.). If a participant did not fulfill his or her requirements under the Programs (*e.g.*, pay required monies and attend a class), ACCS would review the case to determine whether to forward the case to the applicable district attorneys' office for potential prosecution. *See, e.g.*, Welling SJ Decl., Ex. 32 at ACCS 0184 ("Check writers who fail to comply with the program are then subject to possible prosecution" as determined by ACCS case managers applying district attorney pre-approved prosecution criteria). After receiving the

---

Contract at ¶ 3(b)); Tab 5 (Merced County 2002 Contract at ¶ 3(b)); Tab 8 (Riverside County 2002 at ¶ 3(b)); *see also* Tab 8 (Riverside County 1999 Contract ¶ 5.A.7. [requiring ACCS to furnish all materials to District Attorney prior to publication]). It is unclear how uniform the letters and procedural checklists used for each of the participating California counties were, as neither side has presented a comprehensive set of the documents that were in use during the relevant time period for each county. Finally, as discussed below, Don Mealing submitted a declaration indicating that the "initial drafts" of the collections correspondence used by ACCS were drafted and/or created by various district attorneys in the late 1980s and 1990s and were not drafted by Mr. Mealing. *See* Docket No. 1303-1, Declaration of Don Mealing at ¶¶ 3-5.

6

file from ACCS, the district attorney would make a determination of which cases, if any, to criminally prosecute. *Id.*[8]

## LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise

---

[8] Plaintiffs contend that the number of checks handled by ACCS was far larger than the number of prosecutions undertaken by various district attorney offices. For example, ACCS handled over 2,000 unpaid checks per month between 2003 and 2006 for the San Bernardino DA's office. That office, however, prosecuted a total of 864 bad check cases between 1997 and 2009. *See* Welling SJ Decl., Ex. 18 at 985:11-21; Ex. 63 at ACCS 0113003.

United States District Court
For the Northern District of California

genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56©).

**DISCUSSION**

**1.     Whether ACCS Was a Debt Collector under the FDCPA**

Defendants move for summary judgment, contending that because ACCS was not a "debt collector" under the FDCPA, none of the remaining defendants can be held liable for their work with ACCS. Defendants argue ACCS could not be a FDCPA debt collector because: (1) ACCS was simply working as the agent or fiduciary of the district attorneys' offices, and district attorneys are excluded from the FDCPA's definition of debt collectors; and (2) the diversion fees ACCS collected are not "consumer debts" under the FDCPA. Plaintiffs dispute those contentions and affirmatively argue in their motion for summary judgment that ACCS was a debt collector subject to the FDCPA.

**A.     Scope of Authorization**

Defendants argue that ACCS was not running its own debt collection operation, but instead was simply providing administrative support for California district attorneys' diversion programs. Those programs, defendants contend, were exercises of the DAs' prosecutorial powers and exempt from coverage under the FDCPA.[9] As such, defendants argue that ACCS cannot be a debt collector under the FDCPA. Defendants' argument rests on differing theories, which are addressed below; none is persuasive.

As noted above, at least until 2004 the ACCS contracts provided that ACCS was an "independent contractor" of the district attorneys. In *Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1263 (9th Cir. 1996), the Ninth Circuit found that the FDCPA's exemption for debt

---

[9] The FDCPA exempts from the definition of a "debt collector" "any officer or employee of the United States or any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties." 15 U.S.C. § 1692a(6)(c). 2006 amendments to the FDCPA (which excluded private entities operating pretrial diversion programs for alleged bad check offenders under certain circumstances) are not at issue here. *See* 15 U.S.C. § 1692p.

8

United States District Court
For the Northern District of California

collection by government employees, section 1692a(6)(c), did not apply to a private, nonprofit organization with a government contract to collect student loan debt. The Court noted that the FDCPA was very specific about who was included within the exemption -- government officers or employees – and concluded that under the plain language of the statute, private contractors are not exempt. *Id.* (where "'a statute names the parties which come within its provisions, other unnamed parties are excluded.'" (quoting *Foxgord v. Hischemoeller*, 820 F.2d 1030, 1034 (9th Cir. 1987)).

Closer to the facts of this case, a California district court held that an independent contractor running a program remarkably similar to ACCS's was not entitled to protection under the FDCPA's government exemption. In *Schwarm v. Craighead*, 552 F. Supp. 2d 1056 (E.D. Cal. 2008), the Court found that a company which administered bad check diversion programs as an independent contractor on behalf of district attorney offices was covered by the FDCPA, and was not exempt under section 1692a(6)(c). In *Schwarm*, like here, form letters approved by the district attorneys and printed on the district attorneys' letterhead were sent in the collection process. *Id.*, at 1065. The district court concluded that the defendant, despite its relationship with the district attorneys offices, was not exempt from the FDCPA. *Id.*, at 1070 (finding section 1692a(6)(c) " exempts only 'officers' or 'employees,' thus does not apply to private organizations that operate via a contract with the government."). 552 F. Supp. 2d at 1070.

Defendants attempt to distinguish *Schwarm* by arguing that in *Schwarm,* in addition to the contracts with district attorneys, the collection company had direct contracts with the merchants whose debts were being collected, the company offered no education classes, and the company had extremely limited supervision by the district attorneys. *See* Defendants' Reply in Support for Summary Judgment ("Def. Reply") at 10. Defendants provide no citation in *Schwarm* for these points, and indeed the undisputed facts mentioned in the decision are to the contrary. *See Schwarm v. Craighead*, 552 F. Supp. 2d at 1064 (defendant contracted with district attorneys but had a memorandum of understanding with merchants explaining the program requirements; defendant "oversaw coordination of DATS' diversion classes"; and company provided weekly list of checks to district attorneys before commencing

1    collection).

2         Plaintiffs also rely on *Gradisher v. Check Enforcement Unit*, 133 F. Supp. 2d 988 (W.D. Mich.

3    2001). In that case, the district court found that a company acting as an independent contractor for a

4    county's bad check programs was not exempt from the FDCPA. *Id*., at 992. Defendants argue that

5    *Gradisher* is inapposite because the defendant there had no contract with a district attorney at all. Def.

6    Reply at 10. However, the defendant had a contract with the *county*, so defendants' distinction is

7    without a difference. Defendants also argue that the conclusion of *Gradisher* should not apply because

8    that company did not offer diversion or educational classes as ACCS did here. *Id*. However, even

9    though ACCS was required to provide an education class – a requirement of a diversion program under

10   the BCDA – that does not change the fact that ACCS was an independent contractor seeking to collect

11   a consumer debt. Finally, the Court notes while the "independent contractor" language was removed

12   from ACCS's contracts in 2004, there is no evidence that the nature of the relationship between ACCS

13   and the district attorneys or the operations of the diversion Programs changed. In absence of any such

14   evidence, ACCS remained an independent contractor.

15        ACCS's related argument – that it should be shielded from the FDCPA's requirements because

16   it was acting in a fiduciary capacity for a district attorney, and its collection efforts were only incidental

17   to its fiduciary duties (providing educational classes for participants on behalf of the district attorneys)

18   – is likewise without support. ACCS appears to be arguing that it falls within the FDCPA's exception

19   to the definition of debt collection for collection activities "incidental to a bona fide fiduciary

20   obligation." 15 U.S.C. § 1692a(6)(F)(I). In order to fall within that exception, ACCS must demonstrate

21   first, a "fiduciary obligation," and second, that its collection activities were "incidental" to it fiduciary

22   obligation. *See Rowe v. Educ. Credit Mgmt. Corp*., 559 F.3d 1028, 1032 (9th Cir. 2009). In *Rowe*, the

23   Ninth Circuit found that guaranty agencies who guaranteed federal student loans under the Higher

24   Education Act, had a fiduciary duty to the Department of Education. *Id*. at 1032-33. The Court rested

25   its conclusion on the highly regulated nature of guarantee agencies (detailed in regulations promulgated

26   by the DOE), as well as its determination that guaranty agencies "'are essentially the creatures of

27

28                                                        10

regulatory agreements and federal regulations.'" *Id.* at 1033 (quoting *Student Loan Fund of Idaho, Inc. v. U.S. Dep't of Educ.*, 272 F.3d 1155, 1162 (9th Cir. 2001)).

Defendants cannot make a similar showing here. The relationship between the district attorneys' offices and ACCS is governed primarily by the *contracts* between the entities and not by a set of highly detailed state or local regulations. The fact that the BCDA spells out criteria for bad check diversion programs does not alter this conclusion because the statue is providing direction to the district attorneys not, as in *Rowe*, to outside agencies.[10] The fact that ACCS deposited participant payments into a bank account held in trust for the District Attorneys likewise does not transform a contractual duty into a fiduciary one.

Nor can defendants show that ACCS's conduct meets the second criteria; that its collection efforts were only incidental to its supposed fiduciary obligations. In *Rowe*, the collection of debts by entities which guaranteed the defaulted loans was found to be incidental to the primary function of the guarantee agencies – the guaranteeing of student loans made by other entities. *Id.*, at 1035. Here, the fact that ACCS was contracted to provide educational classes in support of the diversion Programs does not make its collection efforts incidental to a *fiduciary* duty as opposed to the contractual duties it owed the district attorneys.[11]

The Courts finds that, as a matter of law based on undisputed facts, ACCS was a debt collector covered by the FDCPA. The fact that ACCS remitted funds to merchants to cover the bad checks and bank fees, and only kept part of the administrative fees and the class fees, does not alter this conclusion. As discussed in more detail below, ACCS was seeking to collect a *consumer* debt onto which fees were tacked to cover Program expenses. The fact that the debts were being collected in conjunction with

---

[10] This conclusion is strengthened by the fact that different BCDA programs operated in different ways. For example, the program at issue in *Schwarm v. Craighead*, 552 F. Supp. 2d 1056 (E.D. Cal. 2008) provided a weekly list of checks directly to the district attorneys offices prior to collection efforts. ACCS, however, operated differently.

[11] Another key distinction between *Rowe* and this case is that in *Rowe*, 77 percent of the debts recovered by the guarantee agencies were returned to the Federal Government. Here the debts being recovered went to the *merchants*, not the district attorney offices which were the contracting entities. Only a portion of the administrative fee charged by ACCS went to the district attorneys.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  diversion programs does not alter the essential nature of the debt.

3  **B.    Scope of District Attorney Involvement in the Program**

4  As a variant of the argument made above, defendants also argue that they should be shielded

5  from the FDCPA because the district attorneys were actually running the diversion programs (and

6  presumably collecting the debts), not ACCS, which was simply functioning in a clerical capacity.  The

7  parties dispute the scope of district attorney involvement in Programs.  Plaintiffs contend that Mealing

8  (and perhaps others at ACCS) drafted the form documents used in the Program (*e.g.*, the eligibility

9  checklist, the Official Notices, the form contracts).  *See* Welling SJ Decl., Ex. 28 (Contra Costa County

10 Jurisdiction Packet).  Defendants do not dispute that ACCS provided the district attorneys a packet of

11 forms and sample documents for the district attorneys to review and adopt.  Plaintiffs do not dispute that

12 district attorneys and/or their employees filled out those ACCS forms, and sometimes edited their

13 content.  However, there is no evidence that the forms and documents actually adopted by district

14 attorneys deviated in any *material* respect, for purposes of this case, from the versions suggested by

15 ACCS.[12]  Defendants also assert that in some counties, representatives of district attorneys were present

16 at ACCS facilities and/or otherwise participated in the eligibility review of checks. Defendants'

17 evidence, however, is limited to one representative from the Riverside County District Attorney's office

18 who maintained an office in ACCS's headquarters in order to review check data and *exclude* check

19 writers who had criminal histories from ACCS's program.  *See* Docket No. 1293, Request for Judicial

20 Notice (Trial Transcript at 1145:15 - 1147:8).[13]

22 [12] As noted above, in his declaration submitted in support of defendants' Reply, Don Mealing testifies that various district attorneys drafted the "initial" notices that were sent by ACCS in the late 1980s and the 1990s.  *See* Docket No. 1301-1, ¶¶ 3-5.  That declaration does not address any of the letters in the "packet of template letters" provided to district attorneys during the time frame at issue: 2000 - 2004.  *Id*., ¶ 6.

25 [13] Defendants argue other district attorneys offices had individuals who oversaw ACCS's operations, but their evidence indicates only that DA offices had investigators who could answer questions about specific cases (*see e.g.*, Request for Judicial Notice, Document No. 1304-1 at 1212:23 - 1213:21 [testimony from DA Gibbons that he assigned an investigator to address problems and questions that were "not routine" or "out of the ordinary"]) and evidence that district attorney employees

12

United States District Court

For the Northern District of California

In sum, the trial testimony regarding the district attorneys' authorization or oversight of ACCS's operations – which plaintiffs argued was introduced in violation of *in limine* rulings[14] – does not alter the fundamental nature of the independent contractor relationship between ACCS and the district attorneys' offices.  Nor does it insulate ACCS's conduct – creating a "turn key" program, including providing pro forma contracts, checklists, and correspondence for adoption by district attorneys – from the FDCPA.[15]

### C.        Whether Fees Collected Were Consumer Debts

Finally, defendants argue that the "diversion fees" they attempted to collect and did collect cannot be considered "consumer debts" under the FDCPA because the "civil debt" created by the writing of a bad check is separate and distinct from the "criminal penalties" associated with a violation of Penal Code § 476a.  Defendants contend that because plaintiffs' obligations to pay the fees at issue stemmed from their "commission of crimes" and their voluntary agreement to participate in the Diversion Program, the debts being collected are not related to the purchase of a service or property as required by the FDCPA.  *See* 15 U.S.C. § 1692a(5) ("The term 'debt' means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or

---

reviewed monthly summaries regarding ACCS's performance in terms of the number of checks in collection, the amount of money returned to vendors, the amount of money provided to the district attorney, and the percentage of program participants who missed classes or completed the program. *See, e.g.*, Request for Judicial Notice (Document No. 1304-1 at 966:11-968:9 [testimony from DA Ramos that staff reviewed monthly ACCS reports and answered questions from ACCS]).

[14] *See* Docket No. 1128 at 20.

[15] Defendants' reliance on cases standing for the proposition that printing and mailing services cannot be held liable for violations of the FDCPA are wholly inapposite to the facts of this case.  ACCS was not simply a printing and mailing service; it was an entity which suggested the text of the collection letters and also created, marketed and administered the debt collection programs themselves. *See, e.g., Trull v. Lason Systems, Inc.,* 982 F.Supp. 600, 607 (N.D.Ill.,1997) ("Absent any evidence indicating Lason's involvement in developing the collection letters," entity that simply printed and mailed debt collection letters on behalf of debt collector not liable under the FDCPA); *Laubach v. Arrow Service Bureau, Inc.*, 987 F.Supp. 625, 629-30 (N.D.Ill.,1997) (absent evidence printing and mailing service contributed to text of debt collection letters, it could not be held liable under the FDCPA).

United States District Court
For the Northern District of California

1    household purposes, whether or not such obligation has been reduced to judgment.").

2          Defendants ignore, however, that at the time ACCS sent out the first Official Notice and started

3    the collection efforts, check writers had not yet agreed to participate in the Diversion Program.

4    Defendants also cannot dispute that as part of their collection efforts they sought recovery of the check

5    amount and associated bank fees for the benefit of the merchants who were owed money.  The fact that

6    administrative and class fees were *added* to the amounts the check writers owed the merchants does not

7    change the fact that the underlying debts that brought the check writers into ACCS's system were

8    consumer debts covered by the FDCPA.

9          Finally, at the point ACCS sent out the first Official Notice, there had been no determination that

10   plaintiffs had committed a crime  – there had only been a report by a merchant that a check writer had

11   submitted a check which did not clear and was not made good.  Defendants argue that at the point a

12   check writer received notice that his or her check bounced, there is a statutory presumption of intent to

13   defraud.  Def. Oppo. at 10.  However, nothing in the statute or California case law supports defendants'

14   contention that a presumption of probable cause of a violation of Penal Code section 476a exists simply

15   because a consumer received notice of a bounced check.[16]  Similarly, the fact that ACCS employed

16   check lists (approved by the district attorneys' offices) to determine whether checks met the criteria for

17   ACCS collection, does not establish probable cause that plaintiffs had the intent to defraud or an

18   admission that plaintiffs committed a crime.  As noted above, those check lists allowed certain types

19   of checks to be excluded from collection by ACCS: checks over a maximum amount; checks over a

20

21          [16]  Section 476a(c) provides that when a check is "protested on the ground of insufficiency of
     funds or credit" the "notice of protest" "shall be admissible as proof of presentation, nonpayment, and
22   protest and shall be presumptive evidence of knowledge of insufficiency of funds. . . ."  However, there
     is nothing in the statute that creates a presumption of willful intent to defraud *at the time* the check is
23   written simply because a check remains unpaid after the writer receives notice of insufficient funds.  *Cf.*
     Cal. Penal Code §476a(a) (requiring check writer "know[] at the time of making" that there are
24   insufficient funds to cover the check).  Defendants' reliance on *Landfried v. Spokane County*, 2011 WL
     1584328 (E.D.Wash.) is likewise misplaced.  The statute at issue in *Landfried* contained an express
25   presumption of intent to defraud.  *Id.*, at *6.  Defendants also rely on *People v. Rose*, 9 Cal.App.2d 174,
     175 (Cal.App. 1935), for the proposition that failure to have sufficient funds is "sufficient evidence" of
26   intent to defraud.  *See* Def. SJ Motion at 22.  However, the Court of Appeal in *Rose* simply affirmed the
     trial court's determination of guilt based in part on evidence regarding the fluctuating status of plaintiffs'
27   bank account preceding and subsequent to the date the check was presented at a bank.

28                                              14

1  certain age; checks without signatures; checks presented in other counties; checks where partial

2  payments had been made; etc.  *See* Welling SJ Decl., Ex. 35.[17]   Contrary to defendants'

3  characterizations, none of those criteria assesses whether probable cause exists that the check writer

4  knew at the time of writing that the check would be dishonored for insufficient funds.  *Cf.* Penal Code

5  § 1001.62 (requiring district attorneys to consider factors *before* sending check writer to diversion,

6  including: the amount of the check, if the person has a prior criminal history, the number of bad check

7  grievances against the person, whether there are other bad check grievances currently, and the strength

8  of the evidence of intent to defraud).

9        The cases defendants cite in support of their argument that the debts at issue are criminal and

10  not civil are inapposite.  For example, in *Bell v. Providence Cmty. Corr., Inc.*, 2011 U.S. Dist. LEXIS

11  61583 (M.D. Tenn. June 7, 2011), the defendant contracted with governmental entities to provide

12  probation services.  The Court found that the fees being collected were related to plaintiff's status as a

13  probationer and were "more analogous to individuals ordered to make child support payments, or

14  subjected to a traffic fines or fee, neither of which arises out of a 'transaction' within the meaning" of

15  the FDCPA.  Here, however, the debts which put plaintiffs into ACCS's system were undoubtedly

16  consumer debts arising out of a transaction between plaintiffs and merchants.  *See also Vaile v. Willick*,

17  2008 U.S. Dist. LEXIS 5111 (W.D. Va. Jan. 24, 2008) (attempts to collect court ordered attorneys fees

18  "would not implicate the FDCPA because it does not arise from a consumer transaction."); *Geiger v.*

19  *Fed. Bureau of Prisons*, 487 F. Supp. 2d 1155, 1159 (C.D. Cal. 2007) (the FDCPA does not cover

20  Bureau of Prison attempts to collect court ordered criminal restitution); *but see Gradisher v. Check*

21

22   [17] Defendants claim that the "DA's probable cause requirements were designed to filter out any
possibility of noncriminal check 'bouncing'" and cite the testimony of Don Mealing at trial regarding
23  the nearly two dozen types of ineligible checks that were screened out by the DA's criteria. Def. Oppo.
at 10-11.  However, the trial testimony cited discusses the steps that merchants take to collect on bad
24  checks.  *See* Docket No. 1301, Request for Judicial Notice, Trial Testimony at 454-455.  The Court
notes that in addition to the intake checklists used by ACCS to determine whether checks qualify for
25  collection by ACCS, ACCS developed for district attorneys a "Prosecution Review Criteria Checklist"
which asked questions to determine which checks – and what associated information – ACCS should
26  forward to the district attorneys office for prosecution.  Welling SJ Decl., Ex. 28 (Contra Costa County
Jurisdiction Packet "Prosecution Review Criteria Checklist").  There is no evidence those "prosecution"
27  criteria were utilized by ACCS in determining which checks to collect on.

28                                             15

*Enforcement Unit*, 133 F. Supp. 2d 988 (W.D. Mich. 2001) (rejecting argument that county-approved bad check collector did "not pursue civil contractual obligations but, rather, criminal law enforcement.").[18]

Defendants also argue that because the diversion fees were not in default when they were collected – and the FDCPA expressly exempts from coverage debt collectors' communications "concerning a debt which was not in default at the time it was obtained by such person," 15 U.S.C. § 1692a(F)(iii) – defendants cannot be liable under the FDCPA. Def. Mot. at 13-14. This argument fails because at the time ACCS started its collection process, the consumer debt was in default due to the bounced check. Defendants attempt to shift the Court's focus to the (later) point at which a check writer agreed to participate in the Diversion Program, and thereby became obligated to pay back not only the consumer debt but also ACCS's administrative and class fees. However, the FDCPA covers ACCS's activities as of the (earlier) date ACCS started its collection efforts.

The Court, therefore, finds as a matter of law that ACCS was a debt collector covered by the FDCPA and, as a result, DENIES defendants' motion for summary judgment.

## 2.   Defendant Mealing's Liability

Plaintiffs move for summary judgment of liability against defendant Mealing, arguing that in light of his role in creating, designing and overseeing ACCS's operations, Mealing can be held personally liable for ACCS's violations prior to the sale of his interest in ACCS in 2004.

### A.   Effect of ACCS Bankruptcy

Defendants argue that Mealing cannot be held personally responsible for ACCS's actions during the class period because ACCS's 2009 bankruptcy settlement extinguished the claims against Mealing.

---

[18] Defendants' arguments would be more persuasive if the only debts they were trying to collect were the extra fees that plaintiffs had contractually agreed to upon their participation in the Diversion Program. However, defendants' debt collection started before any plaintiff had agreed to participate in the Program.

*See* Defendants' Opposition to Plaintiffs' Motion for Summary Judgment ("Def. Oppo.") at 14-15; Defendants' Reply in Support of Summary Judgment ("Def. Reply") at 14; *see also* Confirmation Order [Docket No. 1020-2 (11/2/2009 Order)].  Defendants contend that since the approved bankruptcy Plan extinguished the class claims against ACCS as of 2009, any claims against Mealing were likewise extinguished.  However, Mealing sold his interest in ACCS prior to the 2009 bankruptcy, and defendants point to no language in the Plan or Confirmation Order that would extinguish claims against Mealing individually.[19]  *See* Docket No. 1020-2 (11/2/2009 Confirmation Order); *see also* Def. Oppo. at 4 (noting Mealing sold his interest in 2004 and arguing that conduct post-2004 is irrelevant to this action).  The Plan does not define Mealing as a debtor under the release, and explicitly provides that "Nothing in the Plan shall be construed as releasing any non-Debtor defendants in any of the Class Actions." *See* Request for Judicial Notice, Document No. 1301-6 at ¶ 6.  In the absence of specific language in the Plan or Confirmation Order releasing claims against Mealing, and in the absence of any case law supporting defendants' argument, the Court finds that the ACCS 2009 bankruptcy Plan and Confirmation Order do not bar plaintiffs' claims based on Mealing's individual conduct during the relevant time frame.

### B.    Evidence of Mealing's Personal Liability

In order to determine whether an individual may be liable under the FDCPA, the Court must determine: "1) whether the individual qualifies as a debt collector, and 2) whether that individual has taken an action that violates the FDCPA." *Cruz v. Int'l Collection Corp.*, 673 F.3d 991, 1000 (9th Cir. Cal. 2012).

---

[19]   Defendants also argue that plaintiffs cannot assert alter ego claims against Mealing and Hasney because plaintiffs abandoned those claims in 2009. *See* Def. Oppo. at 14 (citing March 12, 2009 Order [Docket No. 740]).  However, as discussed in more detail below, plaintiffs can still pursue FDCPA claims directly against Mealing and Hasney based on allegations that Mealing and Hasney are personally liable under the FDCPA. *See Cruz v. Int'l Collection Corp.*, 673 F.3d 991, 999 (9th Cir. 2012); *Kistner v. Law Offices of Michael P. Margelefsky, LLC*, 518 F.3d 433, 437-38 (6th Cir. 2008).

United States District Court
For the Northern District of California

### 1.     Whether Mealing Is a Debt Collector

A "debt collector" under the FDCPA is "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). In *Cruz v. Int'l Collection Corp*., 673 F.3d 991, the Ninth Circuit found that an owner, officer and director of a debt collection company was a "debt collector" under the FDCPA where deposition testimony established that he "d[id] everything" for the company, including "collection duties." *Id*. at 999. The undisputed evidence here shows that Mealing was ACCS's principal owner during 2000 until its sale in 2004, he designed and developed the Programs, and he had knowledge of ACCS's operations. Welling SJ Decl., Ex. 14 at 8:6-23; Ex. 46 at ¶ 11; Ex. 48 at ¶ 12. Mealing solicited and negotiated the contracts with the counties. Welling SJ Decl., Ex. 12 at 21:19 - 22:9, 54:20 - 55:4; Ex. 11 at 86:4-25, 143:4-12; Ex. 49 (letter to Mealing). Mealing reviewed and edited policy manuals, scripts and notices used in the collections process. Welling SJ Decl., Ex. 12 at 211:15-18, 269:11-22; Ex. 4 at 56:20-57:4. Mealing and defendant Hasney were the authorized signatories at ACCS for checks issued on trust accounts that ACCS administered for DAs. Welling SJ Decl., Ex. 4 at 74:22-76:6; Ex. 11 at 107:17 - 108. This evidence demonstrates that Mealing was a "debt collector" under the FDCPA, in accordance with the *Cruz* standard.

### 2.     Is Mealing Liable for the Conduct of ACCS

As the Ninth Circuit held in *Cruz*, in order to establish individual liability under the FDCPA, it is not sufficient to demonstrate that an individual is simply a debt collector. *Cruz*, 673 F.3d at 999-1000. Plaintiffs must also show that a defendant "has taken action that violates the FDCPA." *Id*. at 1000. The Court noted that the Ninth Circuit had "not reached the issue of what kind of action the officer of a debt collection company must take to be personally liable under the FDCPA," but did not need to reach that question because the defendant in *Cruz* personally signed a letter that violated the FDCPA. *Id*. Judge Ware, in his June 2010 order finding Mealing liable as a matter of law under the FDCPA, relied on three

United States District Court
For the Northern District of California

lines of cases finding personal liability for an officer or employee: where defendant "materially participated" in collecting debts (citing *Brink v. First Credit Resources*, 57 F. Supp. 2d 848 (D. Ariz. 1999)); where defendant exercised control over the affairs of the collection business (citing *Piper v. Portnoff Law Assocs.*, 274 F. Supp. 2d 681 (E.D. Pa. 2003)); and where defendant was regularly engaged in debt collection (citing *Kistner v. Law Offices of Michael P. Margelefsky*, LLC, 518 F.3d 433 (6th Cir. 2008)).   However, those cases are no longer persuasive authority to the extent that they addressed only the first prong of the test under the FDCPA, i.e. whether the officer or employee of a debt collection company meets the definition of a debt collector.  *See Cruz*, 673 F.3d at 1000 & n.4 (distinguishing *Kistner*); *see also  Brink v. First Credit Resources*, 57 F. Supp. 2d 848 (D. Ariz. 1999) (deciding only that defendant could be individually liable as a debt collector without piercing the corporate veil); *Piper v. Portnoff Law Assocs.*, 274 F. Supp. 2d 681 (E.D. Pa. 2003) (finding that defendants could be individually liable under FDCPA and noting that the individual defendants signed debt collection letters, or authorized others to sign the letters for them).

The Court concludes that under *Cruz*, plaintiffs must demonstrate that Mealing materially participated not only in debt collection but also in the specific FDCPA violations alleged by plaintiffs. Plaintiffs ague that because the very business plan at issue involved "blatant" FDCPA violations, Pls. Mot. SJ at 23, Mealing should be held liable.  However, the fact that Mealing created a business to run check diversion programs for California district attorneys does not, itself, violate the FDCPA.  Instead, the FDCPA liability at issue here – according to plaintiffs' own allegations – is due to four factors:

    (1)    ACCS sent correspondence containing misleading or false threats of arrest, criminal prosecution and fines;

    (2)    ACCS sent correspondence falsely represented as coming from a local district attorney;

    (3)    ACCS demanded and collected fees not permitted by law; and

    (4)    ACCS's communications failed to include mandated disclosures.

In order to prove Mealing liable for those specific violations, plaintiffs need to provide evidence showing that Mealing "materially participated" in each of those violations, such as, for example, that Mealing played a material role in developing, approving or ratifying the contents and format of the

communications in use between 2000 and 2004 that plaintiffs allege violate the FDCPA. *See e.g.,*
*Musso v. Seiders*, 194 F.R.D. 43, 47 (D. Conn. 1999) (defendant could be "personally liable as a debt collector because he knew of the allegedly unlawful procedures being used but nevertheless approved or ratified them").

On the motion before this Court, plaintiffs fail to present evidence regarding exactly which forms and letters were used by ACCS during the 2000 - 2004 time frame and what Mealing's role was with respect to each of the four violations identified above.[20] As such, the Court DENIES plaintiff's motion for partial for summary judgment as to defendant Mealing's liability.[21]

## CONCLUSION

For the foregoing reasons, the Court DENIES defendants' motion for summary judgment (Docket No. 1291) and DENIES plaintiffs' motion for partial summary judgment (Docket No. 1294).

**IT IS SO ORDERED.**

Dated: September 5, 2013

SUSAN ILLSTON

---

[20] Plaintiffs point to deposition testimony that Mealing was at the top of the operational chain of command and that Mealing drafted the "initial" versions of "most" ACCS procedures, manuals and demand letters, and participated in an ongoing basis in developing training materials and scripts for collectors. Pl. SJ Motion at 19. However, the trial and deposition testimony cited does not establish, for example, that Mealing had control over the language used in ACCS's collection letters from 2000 - 2004 or was responsible for deciding that the letters would go out on district attorney letterhead from 2000 - 2004. *See* Welling SJ Decl, Ex. 4 (Mealing had authority to approve a new notice ACCS intended to use in 2000); Ex. 12 at 93:9-19 (Mealing was "instrumental" in developing "processes" ACCS still used in 2006), 269:11-22 (Mealing primarily responsible for drafting first version of most manuals); Ex. 48 at ¶ 12 ("Mealing participated in the design and development of each of ACCS's bad check diversion programs").

[21] Defendants object to the admissibility of many of plaintiffs' exhibits. Those objections rest primarily on two grounds: the exhibit is dated outside of the class period or the exhibit is from other litigation against ACCS and was not produced in this case. *See* Def. Oppo. at 4-6. In this Order, the Court relies on the following exhibits objected to by defendants: Exhibits 5, 12, 13, 14, 25, 32, 46, 48, and 63. The Court has reviewed each of the objections – which go to relevance – and overrules them. The dates of the documents and the fact that some of them arose in other litigation does not undermine their admissibility for purposes of this motion. The Court need not address the objections raised by defendants to evidence not relied on by the Court.

United States District Judge